**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

DR. YI KAO,

          Plaintiff,

    v.

MOUNT NITTANY PHYSICIANS
GROUP, et al.

          Defendants.

CIVIL ACTION NO. 4:24-CV-00101

(MEHALCHICK, J.)

---

**MEMORANDUM**

Plaintiff Dr. Yi Kao ("Kao") initiated this action on January 19, 2024, by filing a complaint against Defendants Mount Nittany Physicians Group ("MNPG") and Mount Nittany Medical Center ("MNMC") (together, "Defendants"). Before the Court are Kao and Defendants' motions for summary judgment. (Doc. 43, Doc. 47). For the reasons provided herein, Kao's motion for summary judgment (Doc. 43) is **DENIED** and Defendants' motion for summary judgment (Doc. 47) is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND AND PROCEDURAL HISTORY

The following background is taken from the parties' statements of material facts and responses thereto.[1] (Doc. 45; Doc. 48; Doc. 52; Doc. 58). MNPG is a team of healthcare providers servicing patients in central Pennsylvania. (Doc. 45, ¶ 1; Doc. 48, ¶ 1; Doc. 52, ¶ 1 Doc. 58, ¶ 1). MNMC is an acute care hospital located in State College, Pennsylvania. (Doc.

---

[1] Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. The facts have been taken in the light most favorable to the non-moving party with respect to each motion.

45, ¶ 2; Doc. 48, ¶ 2; Doc. 52, ¶ 2; Doc. 58, ¶ 2). MNPG and MNMC are wholly owned subsidiaries of Mount Nittany Health ("MNH"). (Doc. 45, ¶ 3; Doc. 48, ¶ 3; Doc. 52, ¶ 3; Doc. 58, ¶ 3). On October 1, 2020, MNPG hired Kao as an otolaryngology physician (also known as an ENT physician)[2] and entered into a Physician Employment Agreement ("PEA") with Kao. (Doc. 45, ¶¶ 7-8; Doc. 48, ¶ 4; Doc. 52, ¶¶ 7-8; Doc. 58, ¶ 4). The PEA outlined the terms of Kao's employment. (Doc. 45, ¶¶ 9-14; Doc. 48, ¶¶ 9-14).

On or about December 15, 2022, the Pennsylvania Department of State Bureau of Enforcement and Investigations, the entity responsible for investigating complaints concerning practitioners on behalf of the Pennsylvania Board of Medicine, subpoenaed Defendants for Kao's personnel and credentials files. (Doc. 48, ¶ 27, Doc. 58, ¶ 27). After receiving the subpoena, Defendants asked MNPG's Director for Surgical Specialties Rachel McMullen ("McMullen") to investigate complaints against Kao. (Doc. 48, ¶ 28; Doc. 58, ¶ 28). McMullen then tasked Practice Manager Bethany Mount ("Mount") with determining whether any employee in the otolaryngology clinic where Kao worked raised any complaints against him. (Doc. 48, ¶ 29; Doc. 58, ¶ 29).

Defendants assert that on December 29, 2022, in response to Mount's inquiry, ENT Clinical Coordinator Debra Walters ("Walters") submitted a statement reporting that she witnessed Kao's hands shaking numerous times during procedures and other staff also showed concern over the shaking. (Doc. 48, ¶ 30). Defendants also contend Walters heard Kao state that his "old eyes can't see well anymore" numerous times. (Doc. 48, ¶ 31). Kao

---

[2] Otolaryngology is "a medical specialty concerned especially with the ear, nose, and throat and related parts of the head and neck." *Otolaryngology*, Merriam-Webster's Dictionary https://www.merriam-webster.com/dictionary/otolaryngology?pronunciation&lang=en _us&dir=o&file=otolar01 (last visited Dec. 4, 2025).

contends these assertions are unfounded and he voluntarily submitted to both a functional capacity examination ("FCE") and vision tests. (Doc. 58, ¶¶ 30-31).

On January 4, 2023, McMullen, Chief Medical Officer of MNMC Dr. Upendra Thaker ("Thaker"), Director of Human Resources for MNH Drew Brungard ("Brungard"), and Employee Health Services Manager for MNH Marissa Ward ("Ward") met with Kao to inform him that they received a complaint about his ability to practice. (Doc. 48, ¶ 32; Doc. 58, ¶ 32). Brungard, McMullen, Thaker, and Ward asked Kao to provide a note from his ophthalmologist and complete an FCE to address concerns with his vision and shaking hands. (Doc. 48, ¶ 33; Doc. 58, ¶ 33). Kao agreed to do both without objection. (Doc. 48, ¶ 34; Doc. 58, ¶ 34). On January 5, 2023, Defendants placed Kao on a paid leave of absence. (Doc. 48, ¶ 35; Doc. 58, ¶ 35). Defendants assert that Kao was placed on leave pending receipt of his ophthalmologist's note and FCE test results, but Kao counters that Defendants used his sick leave and that there is no evidence this leave was only in effect while his note and test results were outstanding. (Doc. 48, ¶ 35; Doc. 58, ¶ 35).

On January 10, 2023, Defendants received Kao's FCE results which indicated a sufficient functional capacity for Kao to return to work. (Doc. 48, ¶ 36; Doc. 58, ¶ 35). On January 11, 2023, Ward received a report from Kao's ophthalmologist, Dr. Jeffrey Heimer ("Heimer"). (Doc. 48, ¶ 39; Doc. 58, ¶ 39). Defendants assert Heimer stated that Kao had "excellent central vision" but that his "peripheral vision has been poor for many years, possibly 40 years, due to a retinal degenerative condition" and this poor peripheral vision does not permit him to pass a driver's examination. (Doc. 48, ¶¶ 39-40). Kao counters that this is an incomplete reading of Heimer's letter and that Heimer's letter speaks for itself. (Doc. 58, ¶¶ 39-40).

As a result of Heimer's letter, Kao had to surrender his driver's license. (Doc. 48, ¶ 41; Doc. 58, ¶ 41). Heimer's letter stated that Kao has retinitis pigmentosa, a retinal degenerative condition with which Kao was first diagnosed in 1980. (Doc. 48, ¶¶ 42-43; Doc. 58, ¶¶ 42-43). Defendants assert that Kao never disclosed this condition prior to Heimer's letter despite the fact that he had to temporarily surrender his clinical privileges in 2018 due to an issue with a lens implant that impacted his ability to see clearly. (Doc. 48, ¶¶ 44-47). According to Defendants, even though Kao had the same retinal condition in 2018, he previously submitted a letter from Heimer's office which claimed he could safely drive when he returned to work after the lens issue. (Doc. 48, ¶¶ 42-43, 53-56). Kao responds that he previously informed various members of Defendants' staff, including Thaker, MNMC Medical Executive Committee Chief of Staff Dr. Wayne Sebastianelli ("Sebastianelli"), and MNPG Chief Operating Officer James Prowant ("Prowant"), about his condition as early as 2020. (Doc. 58, ¶ 44).

As part of their investigation into Kao's vision, Defendants consulted with Dr. Daniel Becker ("Becker"), an otolaryngology physician, who in turn consulted with Heimer. (Doc. 48, ¶¶ 60-62; Doc. 58, ¶¶ 60-62). Heimer informed Becker and Defendants that that Kao has likely had issues with his peripheral vision for twenty to thirty years, has not had a change in his central vision within the past five years, is considered legally blind due to his peripheral vision issues, and the angle of his visual field is about ten degrees in the right eye and twenty degrees in the left eye whereas full normal vision is 140 degrees in each eye. (Doc. 48, ¶¶ 60-62; Doc. 58, ¶¶ 60-62).

On January 23, 2023, Dr. Adam J. Marcovitch ("Marcovitch"), a board-certified ophthalmologist, evaluated Kao and reviewed Heimer's records regarding Kao's vision. (Doc.

48, ¶¶ 64-65). Defendants contend that Marcovitch reiterated that Kao should not be driving but also stated that while Kao should be able to perform his surgical procedures given his small operating field, Defendants should review his surgical privileges to eliminate any procedures which require a larger field of vision. (Doc. 48, ¶¶ 66-67). Kao counters that Marcovitch emphasized that peripheral vision is not necessary for the types of procedures Kao is "currently performing" and that "it would just be a matter of updating his paperwork." (Doc. 58, ¶ 67).

Ward and Becker communicated regarding Marcovitch's findings and on January 27, 2023, Ward sent Becker a list of Kao's in-office procedures and asked him to review and assist Defendants in determining if it is safe for Kao to perform the procedures on the list. (Doc. 48, ¶¶69-72; Doc. 58, ¶¶ 69-72). Becker reviewed the list and recommended eliminating Kao's privileges to perform any procedures which require a larger field of work but also noted that most otolaryngology procedures have a small operating field which the ophthalmologists opined Kao should be able to continue to perform. (Doc. 48, ¶¶ 73-75; Doc. 58, ¶¶ 73-75). However, Becker concluded that he was uncomfortable making a final determination regarding which procedures a physician he never met should perform and stated that the chairperson of the otolaryngology department should review and sign off on Kao's final delineation of privileges based on their own judgment. (Doc. 48, ¶¶ 76-78; Doc. 58, ¶¶ 76-78).

According to Defendants, after receiving Becker's opinion, Ward, Thaker, and Brungard met with Kao to explain that based on Becker's recommendations, Defendants could not permit Kao to perform any non-endoscopic procedures. (Doc. 48, ¶ 80). Defendants posit that on February 3, 2023, Kao voluntarily relinquished his privileges with respect to non-endoscopic procedures and self-reported his condition consistent with the procedures in

Defendants' Practitioner Health Policy. (Doc. 48, ¶ 81). Kao counters that he did not voluntarily relinquish his privileges but rather was directed by Thaker to relinquish his privileges. (Doc. 58, ¶ 81).

Kao completed authorization forms allowing Defendants to share information about Kao's condition with MNMC's Leadership Council (the "Leadership Council"), which evaluates and resolves concerns about the health of a practitioner. (Doc. 48, ¶¶ 13, 83; Doc. 58, ¶¶ 13, 83). The Leadership Counsel is a committee which determines whether certain conditions should be placed on a practice; its members are various MNMC administrators. (Doc. 48, ¶¶ 18, 20; Doc. 58, ¶¶ 18, 20). While the Defendants were investigating Kao's fitness to practice, Kao continued to perform endoscopic procedures. (Doc. 48, ¶ 84; Doc. 58, ¶ 84). Kao asserts that Thaker also directed him to perform microscopic procedures. (Doc. 58, ¶ 84). According to Defendants, the ENT Clinic, the medical clinic Kao worked for, falls within Defendants' larger General Surgery Department. That department is chaired by Dr. Eugene Simoni ("Simoni"). Because Simoni is not an otolaryngologist, he referred the investigation to Dr. David Friedmann ("Friedmann"), a board-certified otolaryngologist. (Doc. 48, ¶¶ 85-88). Kao counters that Simoni would never have been required to sign off on the procedures Kao could perform as the Leadership Council was required to make the final determination, and Defendants' engagement with Friedmann was not in accordance with Defendants' policies and procedures for investigating what procedures a physician can safely perform. (Doc. 58, ¶¶ 85-87).

On February 10, 2023, the Leadership Council met with Friedmann. (Doc. 48, ¶ 92; Doc. 58, ¶ 92). Around February 16, 2023, Friedmann drafted a letter in which he concluded that while there had not been any complications arising from Kao's vision, his vision met the

criteria for legal blindness, and that concerns about his vision were "incompatible" with the "challenges inherent in any surgery in the intricate anatomy of the head and neck." (Doc. 48, ¶¶ 100-01; Doc. 58, ¶¶ 100-01). Defendants provided Kao with a copy of this letter. (Doc. 48, ¶ 106; Doc. 58, ¶ 106).

According to Defendants, Thaker, MNPG's Chief Operating Officer James Prowant ("Prowant"), and McMullen considered whether Defendants could accommodate Kao's condition. (Doc. 48, ¶ 107). Defendants assert that Thaker, Prowant, and McMullen determined that accommodating Kao was not feasible because Dr. Jesse Jennings ("Jennings"), the only other otolaryngology physician at MNPG, worked a reduced schedule, and Kao could not perform all the duties of an otolaryngology physician. (Doc. 48, ¶¶ 107-22). Kao denies that his ability to practice was so limited and that the record shows his limited vision could be accommodated. (Doc. 58, ¶¶ 107-22).

On February 22, 2023, MNPG sent Kao a letter explaining that upon consulting with Becker and Friedmann, it determined that his visual limitations posed a direct threat to patient safety and concluded that no reasonable accommodations would allow him to perform the essential functions of his position as an otolaryngology physician. (Doc. 48, ¶ 123-24; Doc. 58, ¶ 123-24). The letter further explained that MNH was unable to return him to his role as an otolaryngology physician but that he had the opportunity to contact Employee Health to discuss the matter if he believed the decision was in error. (Doc. 48, ¶¶ 124-25; Doc. 58, ¶¶ 124-25). The letter also placed him on an unpaid leave of absence for up to a maximum of six months. (Doc. 48, ¶¶ 124-26; Doc. 58, ¶¶ 124-26). On April 4, 2023, MNMC sent Kao another letter placing him on a medical leave of absence. (Doc. 48, ¶ 129; Doc. 58, ¶ 129). The medical leave was unpaid. (Doc. 48, ¶ 126; Doc. 58, ¶ 126). On June 27, 2023, MNPG sent Kao a

letter informing him of its decision to terminate his employment at the end of his six-month leave of absence upon 60-days' notice, effective August 28, 2023. (Doc. 48, ¶ 137; Doc. 58, ¶ 137).

On January 19, 2024, Kao filed a complaint alleging four counts under state and federal law. (Doc. 1). In Count I,[3] Kao alleges Defendants violated the Americans with Disabilities Act (the "ADA"). (Doc. 1, ¶¶ 44-48). In Count II, Kao alleges MNPG is liable for breach of contract. (Doc. 1, ¶¶ 50-56). In Count III, Kao alleges MNMC is liable for tortious interference with contractual relations. (Doc. 1, ¶¶ 57-59). In Count IV, Kao alleges MNPG is liable for violations of the Pennsylvania Wage Payment and Collection Law ("WPCL"). (Doc. 1, ¶¶ 60-66).

On August 11, 2025, Kao filed a motion for partial summary judgment along with a brief in support, a statement of facts, and accompanying exhibits. (Doc. 43; Doc. 44; Doc. 45; Doc. 46). On September 2, 2025, Defendants filed a brief in opposition to Kao's motion for summary judgment along with an answer to Kao's statement of facts. (Doc. 51; Doc. 52). On September 16, 2024, Kao filed a reply brief. (Doc. 54).

On August 11, 2025, Defendants filed a motion for summary judgment along with a statement of facts, brief in support, and accompanying exhibits. (Doc. 47, Doc. 48, Doc. 49). On October 1, 2025, Kao filed a brief in opposition, an answer to Defendants' statement of facts, an additional statement of facts, and additional exhibits. (Doc. 58; Doc. 59; Doc. 60; Doc. 63). On October 29, 2025, Defendants filed a reply brief and an answer to Kao's

---

[3] The Court notes that Kao labels his four counts claims a, b, c, and d. (Doc. 1, ¶¶ 44-66). The Court will refer to claim a as Count I, claim b as Count II, claim c as Count III, and claim d as Count IV.

additional statement of facts. (Doc. 65; Doc. 66). Accordingly, the motions for summary judgment are now ripe and ready for disposition.

## II.   MOTION FOR SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." *See* M.D. Pa. L.R. 56.1.

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility

determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories, or the like to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony. . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment").

## III.  DISCUSSION

Defendants aver they are entitled to summary judgment on all four of Kao's claims. (Doc. 49, at 12-39). Kao avers he is entitled to summary judgment on his breach of contract and WPCL claims. (Doc. 44, at 6-15). The Court will begin its analysis with Kao's ADA claim before turning to his state law claims.

### A.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON KAO'S ADA CLAIM.

In Count I, Kao alleges that Defendants are liable under the ADA. (Doc. 1, ¶¶ 44-49). Defendants aver that they are entitled to summary judgment because a reasonable jury cannot conclude that Kao was qualified for his position. (Doc. 49, at 13-49). According to Defendants, an employer does not violate the ADA where they conduct an individualized assessment of an employee and come to a reasonable conclusion that the employee is not qualified for their position because they pose a direct safety threat to the safety of themselves or others. (Doc. 49, at 14-16). Defendants aver that they conducted an individualized assessment of Kao and reasonably concluded that he could not safely continue to treat patients due to his visual limitations and there were no reasonable accommodations that could allow him to continue to see patients. (Doc. 49, at 14-39). Kao counters that Defendants are not entitled to summary judgment because a reasonable jury may conclude that Kao is not a direct threat to patient safety based on evidence collected during Defendants' own investigation. (Doc. 63, at 10-24).

The ADA provides that employers "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112. Disability

discrimination claims are analyzed under the *McDonnell Douglas* burden shifting standard.[4]

*See Thimons v. PNC Bank, N.A.*, 254 F. App'x 896, 897 (3d Cir. 2007) (nonprecedential). Under

the *McDonnell Douglas* standard, a plaintiff must first present evidence to establish a *prima facie*

case of disability discrimination. *See Thimons*, 254 F. App'x at 897. To establish a *prima facie*

case, a plaintiff's evidence "must demonstrate: '(1) he is a disabled person within the meaning

of the ADA; (2) he is otherwise qualified to perform the essential functions of the job with or

without reasonable accommodations by the employer; and (3) he has suffered an otherwise

adverse employment decision as a result of discrimination.'" *Thimons*, 254 F. App'x at 897

(quoting *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)). Once the plaintiff meets

their initial burden to establish a *prima facie* case, the "burden then shifts to the employer to

present a non-discriminatory reason for the adverse decision."[5] *Thimons*, 254 F. App'x at 897.

Defendants challenge the second factor of a *prima facie* case, whether Kao is qualified

for his position, arguing that Kao is not qualified because he poses a direct threat to patient

---

[4] This standard was first established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, in which the Court held that when analyzing discriminatory hiring claims, courts first must consider whether a plaintiff has established a *prima facie* case that an employer's decision not to hire them was discriminatory. 411 U.S. 792, 802 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701 (1993). Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to propose a non-discriminatory reason for its decision not to hire the plaintiff. *McDonnell Douglas Corp.*, 411 U.S. at 802-03. If the employer establishes a non-discriminatory reason for not hiring the plaintiff, the burden shifts back to the plaintiff to establish that the employer's proposed non-discriminatory reason is pretextual or "discriminatory in its application." *McDonnell Douglas Corp.*, 411 U.S. at 807.

[5] Defendants only address Kao's *prima facie* case. (Doc. 49, at 13-49). The Court will only address arguments presented by Defendants and thus will limit its analysis to Kao's *prima facie* case. *See Rumanek v. Indep. Sch. Mgmt., Inc.*, 50 F. Supp. 3d 571, 578 n.3 (D. Del. 2014), *aff'd*, 619 F. App'x 71 (3d Cir. 2015) (noting that courts need not address arguments that were not properly raised in a party's briefing); *see also DiGregorio v. Trivium Packaging Co.*, No. 23CV2167, 2025 WL 782091, at *6 (W.D. Pa. Mar. 12, 2025) (same).

safety. (Doc. 49, at 13-49). "A 'qualified individual with a disability' is defined as 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Equal Emp. Opportunity Comm'n v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 517 (W.D. Pa. 2010). "The Code of Federal Regulations divides this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position." *Equal Emp. Opportunity Comm'n*, 696 F. Supp. 2d at 517 (citing 29 C.F.R. § 1630.2 (m)). "[T]he ADA requires an individualized inquiry into the ability of an employee or applicant to perform a particular job, one which focuses on the medical condition's actual effect on the specific plaintiff." *Equal Emp. Opportunity Comm'n*, 696 F. Supp. 2d at 517.

Defendants do not challenge Kao's qualifications based on his training, skills, or experience, but rather, under what is known as the direct threat exception to the ADA. (Doc. 49, at 13-49). While the ADA generally prohibits discrimination, courts have held that "the goal of ending disability discrimination must be balanced against the health and safety risks that disabilities sometimes pose to others. Thus, the ADA contains a direct threat exception, which allows discrimination if a disability 'poses a direct threat to the health or safety of others.'" *Doe v. Cnty. of Ctr., PA*, 242 F.3d 437, 447 (3d Cir. 2001) (citations omitted); *see also Equal Emp. Opportunity Comm'n*, 696 F. Supp. 2d at 519. The exception only applies where the threat "cannot be eliminated by a modification of policies, practices, or procedures, or with the provision of additional aides or services." *Equal Emp. Opportunity Comm'n*, 696 F. Supp. 2d at 519.

To determine that an employee poses a direct threat to themselves or others, an employer must conduct "an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Haas v. Wyoming Valley Health Care Sys.*, 465 F. Supp. 2d 429, 435 (M.D. Pa. 2006) (citing 29 C.F.R. § 1630.2 (r)); *see also Equal Emp. Opportunity Comm'n*, 696 F. Supp. 2d at 519. The individualized assessment must consider factors such as "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." *Haas*, 465 F. Supp. 2d at 435 (citing 29 C.F.R. § 1630.2 (r)); *see also Equal Emp. Opportunity Comm'n*, 696 F. Supp. 2d at 519; *see also Hill v. Greater Philadelphia Health Action, Inc.*, No. CV 19-4928, 2021 WL 3708685, at *4 (E.D. Pa. Aug. 19, 2021).

"The employer bears the burden of proving that an employee or applicant poses a direct threat." *Equal Emp. Opportunity Comm'n*, 696 F. Supp. 2d at 520. "[A] court's analysis of a potential 'direct threat' cannot be based on subjective judgments, but on 'the best available objective evidence' in the record of any dangers posed.'" *Equal Emp. Opportunity Comm'n*, 696 F. Supp. 2d at 520. The threat must be a significant threat and "[t]he existence or nonexistence of a significant risk must be determined from the standpoint of a person who refuses treatment or accommodation, and risk assessment must be based on medical or other objective evidence." *Haas*, 465 F. Supp. 2d at 436. Where there is competing, credible, objective evidence regarding whether a plaintiff posed a significant risk to themselves or others, there is a triable issue of fact regarding the direct threat exception. *See Haas*, 465 F. Supp. 2d at 437 (finding a "triable issue of fact" where there were "two [competing] psychiatric opinions [which] constitute[d] a

reasonable medical judgment" on the issue of whether a doctor posed a significant threat to his patients); *see also Hill*, 2021 WL 3708685, at *4 (finding a genuine dispute of fact where the record showed conflicting medical opinions regarding whether a dental assistant's medical condition posed a significant threat to herself, her coworkers, and her patients).

According to Defendants, there is no genuine dispute of fact that the direct threat exception applies because the record shows that after Defendants learned about Kao's limited vision, they conducted an individualized assessment of Kao's ability to safely treat patients. (Doc. 49, at 16-19). Defendants contend that based on the medical opinions of Heimer, an ophthalmologist, Markovich, a second ophthalmologist, Becker, an otolaryngology physician, and Friedmann, another otolaryngology physician, they reasonably concluded that Kao posed a significant risk to the safety of patients that could not be mitigated by reasonable accommodations. (Doc. 49, at 16-29). However, looking to at the evidence in the record, a reasonable jury could conclude that Kao did not pose a significant risk to the safety of patients, and could have continued to perform the procedures he was already performing on patients.

First, the record contains a letter from Heimer to Defendants in which Heimer states that although Defendants should consult with "an actively practicing ENT surgeon" regarding whether Kao could safely practice, Kao's vision has likely been "without change for 30-40 years, and he has been performing highly technical surgical procedures all these years with success. It would seem that good binocular central vision has served him well in this regard." (Doc. 60-7). Further, in a letter Marcovitch sent to Becker and Defendants after he conducted a vision test on Kao, Marcovitch states:

> I agree that Dr. Kao should be able to perform his surgical procedures given that his typical operating field is quite small. Peripheral vision would not be necessary to do the types of surgical procedures he is currently performing. I would recommend a review of his surgical privileges to eliminate any

procedures which require a larger field of work. Dr. Kao states that he is no longer doing any of these procedures already, so it would just be a matter of updating his paperwork.

(Doc. 48-27, at 2).

The record also contains a letter from Becker in which Becker reviewed a list of procedures to determine if Kao could continue to safely perform the listed procedures. (Doc. 60-27, at 2-3). In the letter, Becker writes "[t]hese procedures have a small operating field, and so with regard to Dr[.] Kao's vision, they fall into the category that the ophthalmologists have opined that Dr[.] Kao should be able to continue to perform." (Doc. 60-27, at 3). Finally, Thaker testified that it was his understanding that based on Becker's recommendations regarding Kao that Kao could continue to perform both microscopic and endoscopic procedures. (Doc. 48-5, at 29).

The Court acknowledges that Defendants present evidence from which a reasonable jury may conclude that Kao could not safely continue to treat patients. For example, Heimer informed Ward that Kao's peripheral vision was well below what is considered normal in each eye. (Doc. 48-26, at 3; Doc. 48-27, at 2). Defendants also present a written opinion from Freedman stating:

> [I]n the interest of patient safety this raises the concern that these visual limitations and the challenges inherent in any surgery in the intricate anatomy of the head and neck are incompatible. In the interest of avoiding complications, proactive steps may prevent adverse events. In my opinion, given Dr Kao's level of disability, it would be difficult for any surgeon to meet quality standards and independently perform surgical procedures safely.

(Doc. 48-38).

A reasonable jury may conclude from this medical evidence that Kao posed a significant threat which could not be mitigated through reasonable accommodation. However, a reasonable jury might also conclude that Kao could safely perform the procedures he was

already performing given that it is undisputed that Heimer, Marcovitch, and Becker are all licensed physicians in the fields of ophthalmology and otolaryngology, respectively, and each provided statements to Defendants indicating that Kao could continue to perform the procedures he was already performing. (Doc. 48, ¶¶ 38, 60, 64; Doc. 48-4, at 29; Doc. 48-27, at 2; Doc. 58, ¶ 38, 64; Doc. 59, ¶ 34; Doc. 60-7; Doc. 60-27, at 2-3; Doc. 66. ¶ 34). A reasonable jury could further review Heimer, Marcovitch, and Becker's communications and echo Marcovitch's sentiment that because the procedures Kao was already performing did not require peripheral vision, accommodating Kao's disability would "just be a matter of updating his paperwork." (Doc. 48-27, at 2). Because the record contains medical evidence which both supports and diminishes Defendants' assertion that Kao posed a significant risk to patients that could not be mitigated through reasonable accommodation, there is a genuine dispute of fact which bars summary judgment.[6] *See* Haas, 465 F. Supp. 2d at 437; *see also Hill,*

---

[6] MNMC also states in a footnote, without support, that "MNMC was not [Kao's] employer and therefore has no liability under Title I of the ADA." (Doc. 49, at 14). A motion for summary judgment must be supported by citations to the record and caselaw. *See Gibbs v. Coupe*, 256 F. Supp. 3d 515, 521 (D. Del. 2017) (denying a motion for summary judgment where the motion was "not supported by law or fact"); *see also Dalie v. Jones*, No. CIV.A. 04-5884, 2007 WL 4275500, at *4 (E.D. Pa. Dec. 4, 2007) (stating "'[i]t is not enough to move for summary judgment without supporting the motion in any way'" (quoting *Celotex Corp.*, 477 U.S. at 328 (White, J., concurring)). Further, to be liable under the ADA, a defendant must have an employment relationship with the plaintiff. *See Campbell v. Drexel Univ.*, 785 F. Supp. 3d 48, 59 (E.D. Pa. 2025); *see also Farrone v. Acker*, No. 2:23-CV-01528, 2025 WL 2996817, at *2 (W.D. Pa. Oct. 24, 2025). When evaluating whether a defendant had an employment relationship with a plaintiff, courts consider whether the defendant had the control over aspects of the plaintiff's employment such the ability to pay the plaintiff, fire the plaintiff, or control the plaintiff's daily activities. *See Campbell*, 785 F. Supp. 3d at 57; *see also Farrone*, 2025 WL 2996817, at *2. Defendants' own statement of facts suggests that MNMC had some degree of control over Kao's employment. Specifically, Defendants describe the Leadership Counsel as an MNMC entity, and the Leadership Council had the power to place conditions on a Kao's practice and was an active part of the investigation into Kao which led to his termination. (Doc. 48, ¶¶ 13, 18-20, 83, 92-94, 99, 130). Defendants' failure to support their assertion that MNMC cannot be held liable under the ADA warrants denying summary

2021 WL 3708685, at *4. Accordingly, the Court **DENIES** Defendants' motion for summary judgment on Kao's ADA claim. (Doc. 47).

    B.  NEITHER PARTY IS ENTITLED TO SUMMARY JUDGMENT ON KAO'S BREACH OF CONTRACT AND WPCL CLAIMS.

In Count II, Kao alleges MNPG is liable for breach of contract. (Doc. 1, ¶¶ 50-59). In Count IV, Kao alleges MNPG is liable for violations of the WPCL. (Doc. 1, ¶¶ 60-66). Kao avers he is entitled to summary judgment on Counts II and IV because his contract with MNPG, the PEA, unambiguously states that Kao could only be terminated in three ways: 1) upon Kao's death or permanent disability, 2) "for cause", or 3) with sixty days' notice. (Doc. 44, at 6-7). According to Kao, it is undisputed that MNPG placed Kao on unpaid medical leave prior to concluding he was permanently disabled and could not cease to pay him without providing him with proper sixty-days' notice of termination.[7] (Doc. 44, at 7-15). Kao posits that none of Defendants' policies or procedures allowed them to ignore the unambiguous terms of the PEA. (Doc. 44, at 7-15). Kao further avers that the WPCL allows employees to collect damages where an employer fails to pay them wages the employer contractually owes, and because MNPG breached its contract with Kao, it is liable under the WPCL. (Doc. 44,

---

judgment on Count I against MNMC. *See Gibbs,* 256 F. Supp. 3d at 521; *see also Dalie,* 2007 WL 4275500, at *4. This is especially true considering there are facts Defendants themselves assert which contradict Defendants' unsupported assertion. (Doc. 48, ¶¶ 13, 18-20, 83, 92-94, 99, 130). Accordingly, the Court **DENIES** Defendants' motion for summary judgment to the extent Defendants argue that MNMC cannot be held liable under the ADA. (Doc. 47).

    [7] The Court notes that in the complaint, Kao alleges MNPG is also liable for breach of contract and under the WPCL for failing to compensate Kao for call shifts he worked between July and September of 2022. (Doc. 1, ¶ 50). On December 1, 2025, the parties filed a stipulation dismissing Kao's breach of contract and WPCL claims as they relate to these call shifts. (Doc. 67). On December 2, 2025, the Court approved the stipulation and dismissed the claims. (Doc. 68). As stipulated by the parties, this dismissal does not impact Kao's remaining claims. (Doc. 67; Doc. 68).

at 14-15). Defendants also move for summary judgment on Counts I and IV. (Doc. 49, at 30-34). According to Defendants, the record shows that MNPG provided Kao with sixty days' notice of his termination and MNPG was permitted to place him on unpaid leave prior to his termination. (Doc. 49, at 30-33). Thus, according to Defendants, MNPG did not breach its contract with Kao and is not liable for breach of contract or under the WPCL. (Doc. 49, at 30-34).

"To prevail on a breach of contract claim under Pennsylvania law, a plaintiff must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Garcia v. Vertical Screen*, 592 F. Supp. 3d 409, 426 (E.D. Pa. 2022); *see also Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 556 (M.D. Pa. 2014); *see also Harry Miller Corp. v. Mancuso Chemicals Ltd.*, 469 F. Supp. 2d 303, 322 (E.D. Pa. 2007). "Claims for violation of the WPCL are entirely contingent upon proof of a contractual obligation to pay wages and an attendant breach of that obligation." *Diodato*, 44 F. Supp. 3d at 559. Thus, the outcome of a party's motion for summary judgment on a breach of contract claim will determine the outcome of a motion for summary judgment on a WPCL claim. *See Diodato*, 44 F. Supp. 3d at 559 (noting that breach of contract and WPCL claims "rise and fall together"); *see also Hegarty v. Bank of New York Mellon Corp.*, No. CV 2:21-21, 2022 WL 2829879, at *10 (W.D. Pa. June 13, 2022) (finding that because a defendant was entitled to summary judgment on the plaintiff's breach of contract claim, it was also entitled to summary judgment on the plaintiff's WPCL claim).

Kao avers that he has established all three elements of a breach of contract claim and Defendants only challenge the second element, a breach of duty. (Doc. 44, at 6-14; Doc. 49, 30; Doc. 51, at 3-7). To determine whether a defendant violated a contractual duty, courts

first must look to the text of the contract. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.,* 247 F.3d 79, 92 (3d Cir. 2001) (stating "Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'") (citing *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)); *see also Camcara, Inc. v. Air Prods. & Chemicals, Inc.*, 663 F. Supp. 3d 443, 454 (E.D. Pa. 2023) (stating "[t]o interpret the contractual terms of the Agreement, the court first starts with its text"). "Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence, instead, the meaning of a clear and unequivocal written contract must be determined by its contents alone." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 92 (citations and internal quotations omitted). "A court may, however, look outside the 'four corners' of a contract if the contract's terms are unclear." *Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93.

Further, a party does not breach a contract by suspending performance after the other party commits a material breach of contract. *See Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) (stating "a material breach by one party to a contract entitles the non-breaching party to suspend performance"). Five factors determine whether a party materially breached a contract:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

*Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012) (quoting Restatement (Second) of Contracts § 241 (1981)).

Whether a party materially breached a contract is generally a factual question for a jury, rather than a question of law to be decided in a motion for summary judgment. *See Int'l Diamond Importers, Ltd.*, 40 A.3d at 1272 (stating "[w]e emphasize that we and other courts consistently have treated inquiries into the materiality of a given breach as fact questions rather than questions of law to be decided from the bench"); *see Fagal v. Marywood Univ.*, No. 3:14-CV-02404, 2017 WL 4540613, at *9 (M.D. Pa. Oct. 11, 2017) (declining to resolve whether a party to a contract was entitled to suspend performance on a motion for summary judgment because the materiality of a breach is generally a question of fact).

Here, it is undisputed that the MNPG and Kao entered into the PEA, which was the contract governing the terms of Kao's employment with MNPG. (Doc. 45, ¶ 7; Doc. 52, ¶ 7). The PEA states that "MNPG is employing [Kao] to work as an Otolaryngology Physician." (Doc. 46-3, at 1). The PEA further states that "you[, Kao,] are being hired as an Otolaryngology Physician and will devote all of your professional time and efforts on behalf of and as an employee of MNPG. You'll be expected to work the required hours of a full time Otolaryngology Physician fulfilling your responsibilities." (Doc. 46-3, at 1). Regarding compensation, the PEA states "MNPG shall pay [Kao] base compensation of $542,990 per year." (Doc. 46-3, at 7). The PEA also states that Kao's "compensation may be adjusted during the Term if there is a substantial and material failure on your part to perform your duties under this Agreement or any act which results in a suspension from your duties." (Doc. 46-3, at 3).

Regarding termination, the PEA states Kao may be subject to automatic termination "upon [his] death or permanent disability," immediate termination "for cause," or

termination without cause after MNPG provides "60 days written notice." (Doc. 46-3, at 3). The parties contest whether MNPG provided Kao with sixty days-notice to terminate him without cause and do not contest whether the PEA's automatic or for cause termination provisions apply. (Doc. 48, ¶ 134; Doc. 44, at 5; Doc. 51, at 3-4; Doc. 58, ¶ 134).

Kao presents a February 27, 2023, letter from Defendants to Kao stating that due to Defendants' determination that Kao was "unable to perform the essential functions of [his] position," he "will remain on continuous medical leave up to a maximum of six (6) months" and that he "may choose to continue [his] benefit elections during this six (6) month period." (Doc. 46-8). The parties agree that this medical leave was unpaid. (Doc. 48, ¶ 126; Doc. 58, ¶ 126). According to Kao, this letter constitutes termination without cause and without the required sixty days' notice. (Doc. 44, at 7-8). Kao posits that based on this letter, no reasonable jury could conclude that MNPG did not breach the PEA. (Doc. 44, at 7-8). However, Defendants present Kao's own testimony confirming that in June 2023, while he was on unpaid leave, he received a letter providing him sixty days' notice of termination and present that letter. (Doc. 46-2, at 81; Doc. 48-42). The PEA does not address the issue of mandatory, unpaid leave or clearly state that MNPG was required to abide by the termination provisions prior to placing Kao on leave. (Doc. 46-8). Kao is not entitled to summary judgment on this issue of termination without notice, because a reasonable jury could determine that he was not terminated when he was placed on mandatory, unpaid leave. *See Burton v. Teleflex Inc.,* 707 F.3d 417, 431 (3d Cir. 2013) (reversing a grant of summary judgment on a breach of contract claim because there was a genuine dispute of fact regarding whether the plaintiff was terminated); *see also Basri v. Trs. of Univ. of Pennsylvania,* No. CV 19-4935, 2020 WL 7231357, at *6 (E.D. Pa. Dec. 8, 2020) (denying a motion for summary judgment on an employment

discrimination claim where there was a genuine dispute of fact over whether a plaintiff was terminated).

However, Kao also avers that the unpaid leave violated the PEA because the PEA mandates that MNPG pay him the agreed upon salary. (Doc. 44, at 7). Defendants counter that MNPG had no obligation to pay Kao's salary because he "could not perform the essential functions of his position due to his medical condition" and the PEA required him to work "the required hours of a full time Otolaryngology Physician."[8] (Doc. 51, at 5). Both parties move for summary judgment based on their contentions that MNPG did or did not have an obligation to pay Kao after placing him on leave, respectively. (Doc. 44, at 7; Doc. 49, at 32-33). The Court finds that neither party is entitled to summary judgment on this issue.

The PEA unambiguously states that Kao was required to work as a full-time otolaryngology physician and adequately treat patients. (Doc. 46-3, at 1). The PEA also states

---

[8] Defendants also aver that the PEA incorporated Defendants' employee handbook by reference and the handbook allowed MNPG to place Kao on an unpaid leave of absence because the handbook "permits an employee to take up to six months of unpaid leave due to illness." (Doc. 49, at 31). This argument fails because for another document to be incorporated by reference into a contract, the contract must make a clear reference to the document from which the document's identity may be ascertained and clearly state that that document governs. *See Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 296-97 (M.D. Pa. 2016) (finding that an employment agreement incorporated policies that the agreement clearly stated the employee "shall also comply" with, but did not include a "wholesale incorporation" of all of the employer's policies because not all policies were referenced in the agreement); *see also Gibel v. Iron Cumberland, LLC,* No. CV 23-2050, 2024 WL 4264969, at *9 (W.D. Pa. Aug. 7, 2024), *report and recommendation adopted,* No. CV 23-2050, 2024 WL 4263763 (W.D. Pa. Sept. 23, 2024) (finding a contract did not incorporate a defendant's policies which were not specifically referenced by the contract). The relevant contractual language from the PEA states that employees are "expected to familiarize [themselves] with our policies and procedures. These are available in the practice's main office." (Doc. 46-3, at 1). This statement does not incorporate the handbook, or any specific policies listed therein by reference because it does not identify the handbook or indicate that the handbook grants Defendants certain powers such as the ability to place employees on unpaid leave. *See Qazizadeh*, 214 F. Supp. 3d at 296-97; *see also Gibel*, 2024 WL 4264969, at *9.

that MNPG may adjust Kao's salary if there is a "material failure on [his] part to perform [his] duties under this Agreement." (Doc. 46-3, at 2). As discussed *supra* Section III.A, Defendants present evidence from which a reasonable jury may conclude that Kao was unable to safely treat patients and thus perform his duties as an otolaryngology physician. (Doc. 48-26, at 3; Doc. 48-27, at 2). Based on this, a reasonable jury also may conclude that Kao materially breached the contract because the jury may conclude, amongst other things, that MNPG was deprived of the benefit of employing a physician who can safely treat patients and Kao could not cure his failure to comply with the terms of the PEA. *See Int'l Diamond Importers, Ltd.*, 40 A.3d at 1271 (listing factors to consider when assessing the materiality of a breach of contract). As contemplated by both the PEA and general principles in contract law, if Kao materially breached the PEA, MNPG would be permitted to suspend performance of its obligation to pay Kao. *See* (Doc. 46-3, at 2) (stating that MNPG may adjust compensation based on a material failure to perform; *see also Widmer Eng'g, Inc.*, 837 A.2d at 467 (noting that under Pennsylvania contract law, a party to a contract may suspend performance where the other party materially breaches the contract). However, also as discussed *supra* in Section III.A, Kao presents evidence from which a reasonable jury could conclude that Kao could continue safely treating patients. (Doc. 48-4, at 29; Doc. 48-27, at 2; Doc. 60-7; Doc. 60-27, at 2-3). There is a genuine dispute of material fact regarding whether MNPG breached the PEA by placing Kao on unpaid leave. *See Int'l Diamond Importers, Ltd.*, 40 A.3d at 1272 (noting that whether a party materially breached a contract is generally a question of fact for a jury); *see Fagal*, 2017 WL 4540613, at *9 (same). Accordingly, both Kao's motion for summary judgment on Count II (Doc. 43) and Defendants' motion for summary judgment on Count II (Doc. 47) are **DENIED**.

Because there is a genuine dispute of material fact regarding whether MNPG breached the PEA, there is also a genuine dispute of material fact regarding whether MNPG is liable under the WPCL. *See Diodato*, 44 F. Supp. 3d at 559 (noting that the outcome of a motion for summary judgment on a breach of contract claim is determinative of the outcome of a motion for summary judgment on a WPCL claim); *see also Hegarty*, 2022 WL 2829879, at *10 (noting the same). Accordingly, both Kao's motion for summary judgment on Count IV (Doc. 43) and Defendants' motion for summary judgment on Count IV (Doc. 47) are **DENIED**.

C.  Defendants are entitled to summary judgment on Count III.

Finally, in Count III, Kao alleges MNMC is liable with tortious interference with contractual relations. (Doc. 1, ¶¶ 57-59). Defendants aver that they are entitled to summary judgment because Kao fails to present evidence that MNMC took any purposefully actions to harm the relationship between Kao and MNPG. (Doc. 49, at 34-36). Defendants further aver that even if Kao did present evidence of interference, MNPG's actions were justified to protect patient safety. (Doc. 49, at 36-39). Kao fails to respond to Defendants' arguments.

"Courts within the Third Circuit have routinely held that a non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended." *Diodato*, 44 F. Supp. 3d at 556; *see Cicchiello v. Beard*, 726 F. Supp. 2d 522, 531 (M.D. Pa. 2010), *aff'd sub nom. Cicchiello v. Sec'y Pennsylvania Dep't of Corr.*, 458 F. App'x 117 (3d Cir. 2012) (finding that a defendant was entitled to summary judgment on a claim because "Plaintiff's failure to address this claim in her brief in opposition constitutes an abandonment of the claim"); *see Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003), *aff'd*, 136 F. App'x 551 (3d Cir. 2005) (stating "Plaintiff makes no response to [the defendant's summary judgment] argument, and thus has waived his opportunity to

contest it"); *see also Kluender v. United States Liab. Ins. Co.*, No. CV 22-3650, 2025 WL 886949, at *4 (E.D. Pa. Mar. 21, 2025) (stating "[w]here a plaintiff fails to address a claim in their opposition to a summary judgment motion, it is proper for the Court to grant summary judgment on that issue"). Because Kao does not respond to Defendants' arguments regarding Count III or otherwise defend the claim despite the extensive briefing related to the instant motions, "it is proper for the Court to grant summary judgment on [Count III]." *Kluender*, 2025 WL 886949, at *4; *see also Diodato*, 44 F. Supp. 3d at 556; *see also Cicchiello*, 726 F. Supp. 2d at 531; *see also Ankele*, 286 F. Supp. 2d at 496. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on Count III. (Doc. 47).

IV.    CONCLUSION

For the foregoing reasons, Kao's motion for summary judgment is **DENIED**. (Doc. 43). Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**. (Doc. 47). Defendants' motion is **GRANTED** as to Count III, Kao's tortious interference claim. Count III is **DISMISSED**. (Doc. 1, ¶¶ 57-59). Defendants' motion is **DENIED** as to Counts I, II, and IV. (Doc. 47).

An appropriate Order follows.

Dated: December 5, 2025                    *s/ Karoline Mehalchick*
                                           **KAROLINE MEHALCHICK**
                                           **United States District Judge**